And we'll call the next case for the Advanced Court here, and that is Oberdorf v. Amazon. Counsel. His name is David Wilk. I'm here on behalf of the appellants, Heather and Michael Oberdorf. With the court's permission, I'd like to reserve five minutes of my time for rebuttal. Granted. OK, thank you. Amazon is a seller under existing Pennsylvania Supreme Court precedent. In the case of Musser v. Vilsmeier, the court specifically adopted the policy rationale, section 402A of the restatement. When you look at Amazon's business model and the way they operate, you will see that they clearly meet that definition under the four factors enunciated in Vilsmeier. Those factors are whether the actor is the only member of the marketing chain available to the injured plaintiff for redress, whether the imposition of strict liability upon the actor serves as an incentive to safety, whether the actor is in a better position than the consumer to prevent the circulation of defective products, and whether the actor can distribute the cost of compensating for injuries resulting from defects. Amazon exerts extreme control over both sides of the transaction. They have exerted extreme influence over the products a consumer sees when they conduct a search on its platform. They completely dictate to the vendors how they're going to operate business on the platform. Amazon collects fees from both the buyers and vendors of products through the marketplace and distributes payments to vendors after a deduction of Amazon's fees. Through the Business Services Agreement or the BCA, a unilateral mandatory contract between Amazon and vendors, Amazon controls the terms by which sales are to take place as well as the content and format of advertisements for sale. Consumers make payment directly to Amazon and receive a receipt from Amazon. Amazon prohibits communications between vendors and consumers other than through the transactions which takes place on its marketplace. Amazon influences and often dictates to vendors the price they can charge for the products. Amazon specifically prohibits in the BSA a vendor's ability to charge more on Amazon than where it does on other platforms or other places where it may sell products. Amazon requires that the product be sold at the lowest on Amazon's site. Amazon even reserves unto itself the method of delivery that vendors may use to deliver products to consumers, often and have on occasion prohibited the use of certain delivery methods. When you look at the first factor, it certainly weighs in favor of finding Amazon a seller. Not because Amazon has ability to pay damages, but because Amazon, through their business model and testimony of their own corporate designee in this case, fails to vet third-party vendors for unsafe products or confirm the ability to be served legal process. Amazon enables third-party vendors, such as the one in this case, to structure and conceal themselves from liability altogether. As a result of the system created by Amazon, Amazon is the only member of the marketing chain available for redress. As to the second factor, Amazon exerts substantial control over third-party vendors. Amazon has a right and its sole discretion to suspend, prohibit, or remove any product listing, to withhold any payments to third-party vendors, to impose transaction limits, to terminate or suspend any service to a third-party vendor for any reason at any time. Amazon is fully capable in its sole discretion to remove unsafe products from its platform. Imposing strict liability on Amazon would certainly be an incentive for them to do so. Amazon's business model fails to prioritize consumer safety in any way. To allow Amazon to escape strict liability under its business model would give incentive to companies to design similar models, like that of Amazon, that do nothing to protect consumers from defective products. Under the third factor, a substantial majority of third-party vendors have an ongoing relationship with Amazon, selling products to consumers who utilize the platform. The potential for continuing sales encourages an ongoing relationship between Amazon and vendors, which uniquely positions Amazon to receive reports of defective products, which can lead to products being removed for sale. In their law review article, The Heavy Hand of Amazon, A Seller Not a Net Neutral Platform, Brooklyn Law School professors Edward Janger and Aaron Tursky drill down in detail on how Amazon manipulates the entire sales experience from both the consumer perspective and from the ability of sellers to conduct business. Amazon exercises significant control over every transaction, both in terms of how the transaction is filled, but also who gets the opportunity to make a sale. Amazon entails the right of third-party vendors to communicate directly with site users. Well, let me at this point begin with a non-merits question, and it is that we are all aware now, have been made aware, that there is pending before the Pennsylvania Senate Bill number 516, which does go to a possible statutory change that would greatly impact on this and other cases. I'm asking your position at this juncture, as I will inquire of the other side, does this pending legislation present for us a situation that should give us pause such that we should perhaps certify this question to the Pennsylvania Supreme Court, or alternatively hold off for a while in deciding this case until we see where that legislative proposal is going? Well, I would not suggest holding off, given my understanding of the Pennsylvania State Legislature. We may be waiting a long time. Let me warn you at this point, we do have a former member of the Pennsylvania Assembly on this panel. I apologize. But he may not disagree with you. Yeah, we want to be respectful in any of this. Understood. Understood my apologies. I wish to remain silent. I guess the first thing I would say is that I believe it's the court's function to apply existing Pennsylvania precedent. I believe that legislation has been pending since April of last year. Who knows if and when it's ever going to be brought to a vote or put on the governor's desk for continuation. Is it retroactive as it is worded? Because if it's not retroactive, it really doesn't make any difference, does it? No, that would be true. And, Frank, in all candor, I'm not certain. I just looked it over recently. I would say that under existing precedent, we believe we win, that Amazon should be considered a supplier, a seller, under the judicially created doctrine of 402A. Why don't you answer the question about certification? Based upon your assertion that given existing Pennsylvania jurisprudence on 402A, we win, I would infer from that that you would not have a problem with certification. No, I wouldn't. I guess my only point would be we feel we win. If you feel it's something that should be addressed, we certainly would welcome certification. Aren't there highly significant policy interests in play? Mayor, you just quoted the four policy factors from the Francione case, right? I mean, it's all about policy. Should the Pennsylvania Supreme Court be making those policy decisions before this court does, since they're about Pennsylvania law? If this court believed that that is the proper context, we would have no objection to it being certified. Well, we wouldn't be ruling on an objection. We're asking you, what would you like us to do? What do you think? I would like you to rule, you know, as the majority of the panel did previously. Do you want us to predict based upon Hoffman that what the Supreme Court of Pennsylvania would have done is what Hoffman did with the or Muster, yeah, with the case law with the Pennsylvania Supreme Court? It's what the district court judge, it's what the did, it's what the panel did, it's what federal judges do when they're presented with unanswered questions. Even if you win. Even if you win. And let's say we come down on your side. Does that really bind the hands of even the Pennsylvania Superior Court in saying, okay, Third Circuit said X, but that's not the way I read Pennsylvania law. No, it doesn't. Counsel, can I put this another way? By my count, we as an en banc panel haven't passed on an issue purely of state law for 50 years. Is this the case where we do it? Or should we punt and have the Pennsylvania Supreme Court? I would suggest to you that given the omnipresence of Amazon and the situation and the amount of impact that this has on society, certainly if there is ever a case. That's a good reason or those are reasons for us to decide the question of whether or not to en banc. But is that a reason for us to delve into, as Judge Jordan has pointed out, a very policy-based question and the Supreme Court has characterized it as such and set forth the very factors that you have recited here as policy-bound factors. Well, let me. Could he answer the question? All right. All right. I understand what you're saying. I cannot necessarily disagree with it. Ultimately, if the issue is presented before the Pennsylvania Supreme Court, they would have the ability to rule consistent with whatever decision you would make or contrary to. In Musser, the court stated the gravamen of Section 402A is that a buyer ought not be put to risk from a defective product by one who could prevent it. Doesn't that give us sufficient policy instruction that we could on our own decide this issue? Well, absolutely. I think in great detail the Musser case goes through the policy considerations to be considered. I think all that's being done in this case is applying them to a modern consumer transaction. When you say all that's being done, that sort of puts the thumb on the scale. This is a gigantic question about. Let me ask you my question this way. You say in your supplemental brief, quote, Amazon put the product in the stream of commerce. As a factual matter, is that accurate? Did Amazon put the product in the stream of commerce? I think it is. Wasn't it shipped directly? Wasn't it shipped directly from the furry friends? It is. So they didn't put it in the stream of commerce. I put it to you. The question really ought to be is Amazon facilitating the putting it into the stream of commerce or is Amazon actually the stream of commerce? Is Amazon the place where the defendant who ultimately I think your client thinks is responsible decided to put the product? Or is Amazon just like any other retailer? Is it a market maker, as the dissent on the panel said, or is it putting stuff in the stream of commerce? I believe that the way Amazon operates, it is placing it in the stream of commerce in the sense that Amazon, through its algorithms, selects when someone types in a product, they curate and choose what responses those people get. Then answer me this. In that same page on that supplemental brief, you say that Amazon, quote, put her, meaning the plaintiff, in contact with the seller. Isn't that being a market maker? Except that that would be the case in the case of a newspaper classified ad. In this case, where Amazon facilitates what the consumer sees and the terms by which the transaction is completed, collects a fee, keeps her cut, sends it on. It's much more involved in the process. Why is it any different than an auctioneer? Because Amazon, an auctioneer is tangential to the transaction. And they have a one-time relationship with the parties. Well, that is a fundamental question here, maybe one that even has a factual component to it, because tangentiality, if that's a word, appears in numerous of the Pennsylvania Supreme Court decisions, correct? Yes. So if Amazon were determined to be tangential to this transaction, they should not be considered a seller for two-way purposes, right? That's the way that, using that term, that's the way the Pennsylvania Supreme Court- So why are they not tangential, consistent with several of the questions asked by my colleagues? Well, again, I think you need to look at how they operate and how they facilitate products being offered to sale to consumers. Again, this is not some random connection that's being made. When someone looks for a product, Amazon, through its business model, the algorithm it uses chooses the products that are put in response to that search. It dictates the very terms about how a seller can conduct its business with the vendor. You're saying they're the efficient cause of the transaction. This transaction doesn't happen without Amazon. Absolutely. All right, but to Judge Krause's question, how does somebody sell a fine work of art without going through Sotheby's or Christie's or some other auction house? Isn't the auctioneer also the efficient cause of that transaction as well? Yeah, but in a much more limited way. They don't have any influence necessarily over methods of delivery or prices charged. Amazon dictates essential elements of the transaction to each and every vendor. It facilitates the products that consumers see. Does it set the price? It can set the price. It doesn't directly set the price. But if Amazon feels that a vendor is charging too much- So that's not setting the price. That's setting a particular limit? Well, I mean, if it can change the price, I don't know how that's not setting the price. Amazon can say, we think you're charging too much. We're going to offer an Amazon back discount. We're asking you to reduce the price. Counselor, my concern is you and your answer answering on two levels. Right now we're talking about what they actually do currently. But it's not clear to me how price or shipping terms bear on safety, right? But at other points, your argument is what they could do with the market power they have. And so the majority stressed, well, they could indemnify, they could supervise safety. And the dissent said, well, but why are we looking at what they could do? We've got to focus on what they actually do. And they don't actually dictate how big the product is, how sturdy the D-ring is, et cetera. So what's your basis in Pennsylvania law for saying we should be focusing on what they could do or have the power to do as opposed to what they actually do the way they've in fact set up their business model? Okay. I think when you look at the factors and musters, what underscored on all those factors is the ability to try and ensure safe products and the removal of unsafe products. So don't we only get to those factors after we first decide if Amazon's a seller under CAFASO? If that's the case, I mean, if you want to consider that threshold question, certainly I think Amazon's a supplier. What's if about it? Didn't Frank Dionne make that pretty clear and its progeny? If that's the case, then I think clearly under any reasonable definition of supplier, Amazon meets that threshold answer. Yes, well, I'm hearing ifs, but I mean, I may be reading those cases wrong, but it seems to me that that is the order of battle that has been laid out by the Supreme Court, that if there's a requisite step before the French union's policy factors that are set out, you're not going to reach those factors unless and until you've decided that you have a seller. But you don't need to reach the factors unless you don't have a seller. I'll just put the language in front of you, Mr. Wilk, if I might. This is the language from CAFASO. Appellants ignoring the precondition necessary for application of this analysis, that is establishment of the appellees as sellers, would nevertheless apply it. Now, isn't that a very clear statement that there's an order of operation here and the determination of who is a seller has to precede the application of the policy factors from Francione? Fair enough. And I would suggest that under any reasonable definition, Amazon would be a seller under that initial question. Mr. Wilk, let me ask you this. Let me go back to Judge Segarra's point. My understanding of your answer to the certification question is you have no objection to it. Let me get a little bit tighter. Assume you're sitting here instead of standing there. Do I answer this question? All we're doing is talking about Pennsylvania law, or do I certify it to the Pennsylvania Supreme Court? One or the other. I think 402A has application in other jurisdictions beyond Pennsylvania that is adopting it. I believe your court, this court, resolving this question advances the analysis in a way that it does not. We're concerned about this case and this Pennsylvania law. It's all we're talking about here is Pennsylvania law. Do we answer the Pennsylvania law question or do we certify it? Are you happy with us? That's a tough question. I don't know how to answer it. I mean, I would be, I guess, I don't have a. . . We're going to rule in your favor, you want us to. . . If we're going the other way, certify. We don't give advisory opinions. Understood. And I wouldn't take this up. But you agree. We're talking about things unique to Pennsylvania. And when you say 402A has application elsewhere, that sounds like you're conceding that there should be a uniform standard, in which case we'd be looking to other courts in the way they have approached Amazon as seller. No, and I stand corrected. I have a bit of an overstatement on my part. I mean, obviously, it addresses Pennsylvania, its adoption of 402A, the way the Pennsylvania Supreme Court has interpreted that in cases. Isn't there a real benefit to the plaintiff here in having this certified? Because, as the Chief Judge noted, and others have noted, Judge Amber might have mentioned, it only takes one Pennsylvania state court to say they got it wrong, and whatever we do goes out the window. But if this goes to the Pennsylvania Supreme Court, and who knows when another opportunity to get in front of the Pennsylvania Supreme Court will be, you'll get a ruling that is definitive and binding. Is that not good for the plaintiff and good for others who might be in the position you're worried about, being like the plaintiff? Yeah, stated that way, it's difficult for me to argue against this. Let me ask you. I'll adopt your position. You're a very agreeable guy. I try. I try. Let me try this, too, as a possibility, following up on Judge Jordan's question. Isn't it possible, isn't one possibility here, that we could rule in favor of your client, predicting what the Pennsylvania Supreme Court would do, that the Pennsylvania Supreme Court could still take another case, let's say a case with Amazon, reach the same result that we did, but disagree with our reading of their cases or with the analysis of their cases? Sure. Doesn't that, too, point to the Pennsylvania Supreme Court as being the better forum to resolve this question and to resolve it relying upon their own jurisprudence? Again, I can't argue with that rationale. Is there also another reason that you might wish to have it certified? You've got one circuit interpreting Tennessee law that goes the other way. You've got another circuit interpreting Maryland law that goes the other way. And basically the major argument in your favor is that the Pennsylvania cases support your position with regard to this particular restatement provision, more so than other states. And why not let Pennsylvania decide if indeed that's the case rather than create a circuit split? That's true. I would just note that those other circuits, they were state statutory schemes and were not applying 402A, you know, in reaching their decision. Understood, but you can see a trend line. Yes. What if Pennsylvania won't accept certification? What if they say, we have ruled on this issue of law. We have stated in Musser if the supplier is not a seller, what are the four factors you look to? You've got all you need to decide the case. Shouldn't we, even if we certify, be prepared to decide it? Because Pennsylvania Supreme Court may say, we've already given you the framework you need to decide this. I've never been in a position where a case was certified and rejected. Oh, we have. So I would defer to whatever happens next. Does it come back here and then you do it? In fact, we have in a 402A. We had one in 09, Judge McKee and I. All right. Barrier. And we decided, does Pennsylvania, is it going to take a restatement second or restatement third? And so we thought, well, it's a really tough question. Let them decide. They declined to accept certification. So we had to decide. We said, okay, it's going to go by way of adopting the restatement third. Five years later, they take the case, another case, and go just the opposite way. And you go, well, thank you very little. Well, in fairness, let us also note that the composition of the Pennsylvania Supreme Court is decidedly different right now. In terms of who the justices are from back at that time. Is the furry gang a Chinese company? I note that you wrote a letter to someone in San Francisco when you were trying to reach them addressed to May Quan or Quan May. That was the name associated with the account. I mean, neither us nor Amazon, who literally sent up a private investigator to Nevada to find somebody, were able to find really who the entity was. Whether it actually was a Chinese national. Did it happen to be selling dog cows? Or whether a Chinese company. It's not clear. I don't think anybody knows. The reachability of a company, of a seller, if liabilities claim to provide a remedy. Is that, or the impossibility of reaching that seller, is that a factor under, it fits within the four Francioni factors? Yeah, actually, I believe it fits in the first one, which is whether the actor is the only member of the marketing chain available to the under plaintiff for redress. And again, because of the way the system is set up, where these vendors are able to conceal themselves, oftentimes in these situations, Amazon would be the only one available. Let me ask a question about how far the rule you want would reach. Under your analysis, would eBay be a seller and therefore subject to strict liability? You need to look, I think, at the agreement. I may have even in a joint appendix at some point in the district court submitted the eBay agreement that I found at that time. And it's different in a lot of significant ways as far as dictating the precise manner in which transactions are completed. So it really depends on looking at each entity and how they operate. All right, Mr. Wilk, maybe we can follow up on that when you're back on rebuttal as well. Thank you very much. Mr. Murphy. Good morning. May it please the court. I'm Brendan Murphy with Scott Martin of Perkins Cooley for Amazon.com. The district court's judgment should be affirmed because under ERIE, the federal courts are not empowered to expand state tort law absent an authoritative signal in state law. All of the signals point strongly in the opposite direction. The Pennsylvania Supreme Court has adopted a presumption against expanding liability, whether in strict liability or tort, which can only be overcome by a clear predominance of policy justifications. This presumption makes sense because there are many conflicting interests and stakeholders beyond those involved in a single lawsuit. The Pennsylvania Supreme Court has made clear that the General Assembly, not the courts, state or federal, is the appropriate body to develop the facts, consider the consequences, and resolve the many interests at stake. In Tincture v. Omega Flex, 2014 Supreme Court case, the court stated that strict liability and its limits reflect a balance of interests respecting what is socially or economically desirable. That's at 392 of the Atlantic Reporter. The court identified some of those interests as prices, selection and availability of products, and employment, the kind of things that are not addressed in the very thin record here and that are also not even mentioned or accounted for in the list of reasons given in 1977 in Francione for treating commercial lessors as sellers. The court in Tincture wrote that the General Assembly is the preferable forum for, quote, altering existing allocations of risk created by long tenured common law rules, close quote, and warned that courts should resist the temptation of experimentation with untested social policies. And this warning is especially pertinent here, given that the legislature has in front of it a bill that would define sellers as well as the scope of seller liability. Now, we're not suggesting that an unenacted bill supplies the rule of decision here, because it does not. It is a data point that should be considered in light of the Pennsylvania Supreme Court's admonition that these kind of issues are best addressed in the legislature. It's also notable that it would reflect a trend line of a retraction of seller liability, not an expansion. To the extent that Pennsylvania has addressed the issue of unavailable tort feasors, which is the issue underlying plaintiff's request to expand strict liability, it has rejected the sort of loss-spreading insurance system that they seek to impose. The General Assembly adopted the Fair Share Act in 2011, which severely restricts joint and several liability. That's codified at 42 PACS 7102. That act reflects the General Assembly's view that saddling defendants with an uncollectible share is not fair. The courts have also declined to relax traditional tort requirements like causation to account for an unidentifiable manufacturer or seller. That was the precise issue posed in the lead paint cases, where the Pennsylvania Supreme Court in Skipworth v. Lead Paint Industries in 1997 and this court in the city of Philadelphia v. Lead Industries rejected the market share theory of liability. The Supreme Court has addressed the issue of an uncollectible share in precisely this context of service providers. CAFASO is the classic uncollectible share case. The manufacturer of the mandibular implant there was bankrupt. And the court still maintains the bulwark or the wall between services and suppliers and said that supplier status is necessary to even activate 401A. It uses the word activate 401 or 402A, excuse me. The Supreme Court has also repeatedly rejected loss-spreading as a rationale for a tort rule. In Lance v. Wyeth in 2014, the court recognized that it is necessary to maintain limiting principles on strict liability. And it wrote that it eschewed the notion of a pure loss-spreading tort system and held to the understanding that it is not for the courts to make manufacturers and suppliers insurers for their products. That's at 452, note 22. And in Coyle, the Supreme Court noted that reliance on cost-shifting is the only factor to be considered and whether a party should be liable would result in absolute liability rather than strict liability. And it is consistently declined to adopt any form of absolute liability. By contrast, there are no signals indicating that Pennsylvania is poised to expand strict liability to entities that did not select, control, or even touch the product. Mr. Murphy, throughout your five-minute presentation, five minutes is uninterrupted time, which is over and that's why I now interrupt you. You have frequently invoked the word expand and expansion. What you haven't told us is how is this an expansion of liability under Pennsylvania Supreme Court jurisprudence as well as the intermediate court, the superior court's decisions. If I was struck by one thing, and it's not that I haven't noticed it before, I'm from a Pennsylvania and been around a good number of years. It is the fact-bound nature of just about every one of these major cases, how much they turn on their facts. And, of course, given that policy considerations are so important in the Pennsylvania Supreme Court's equation, I suppose that's inevitable. So how would our determination that Amazon is a seller expand, expand upon existing jurisprudence? The bedrock rule of Pennsylvania law as well as rule, excuse me, Resentment 402A everywhere is that liability is based on a relationship to the product. It started out as just being the seller. That's the word used in 402A. And then the courts expanded it to certain other categories that were deemed to be like sellers, lessors, bailors, basically the suppliers for the overarching word. And even the possibility of an auctioneer under the right factual circumstances. Well, I actually don't think there's anything in 402A or anything, and certainly not in Pennsylvania law, that actually admits to that expansion. And, in fact, all auction cases go the other way. There's Texas auto auctions or Dantone in Arizona. And there's a pair of cases in California. And Musser talks about a continuous relationship or exclusivity. And as has been argued here, the relationship that Amazon has with certain sellers is not only an exclusive relationship, but is the sole means for those sellers to enter the U.S. marketplace. Well, there's actually I don't know that that is true. There's nothing in the record to indicate that that's even true in this case. The record indicates that the furry gang appears to have been located in Nevada, and I believe that's where the package was actually shipped from. But there's also been an assumption in this case that the manufacturer is somehow not around. That's not necessarily accurate. JA-338 is an affidavit from a paralegal and plaintiff's counsel's office that identifies the probable manufacturer as Love Pets or Farler International. But we're not talking about just this case. We're talking about whether this business model is one that would be treated as a seller, as a term of art under Pennsylvania law. Well, when we start to get into the overall business model, then we're really encroaching on what the Pennsylvania Supreme Court has talked about, about the various policy interests at stake. None of these policies are really even identified in the briefing. And there's nothing in the record that would reflect on the things that Tincture instructs the courts to. Why would it be policy interests? Aren't we looking at the contract to look at the conduct of how Amazon acted with respect to the vendor? And doesn't that tell us whether it acts like a supplier, analogizing to other cases? We're not even talking about policy. We'll assume for the purposes we have to be at step one. We have the contract. There's been provided also for the record the testimony before the subcommittee that also talks about the actions of Amazon and how it does things about the price, does things about product selection by Amazon choice, letting consumers rate things, affecting how the search returns. It has the ongoing relationships, like some of my colleagues say. So I don't think, at least for me, I didn't hear the question about policy. I'm hearing the question about activity. Is there any communication between the manufacturer and the seller? Sure. So the relevant portions of the BSA are at, I believe they're at JA162 to 164, and they establish that the seller is responsible for sourcing the product, is responsible for setting the price, is responsible for providing the information about the product. But there's a baseline of what the price can be. It can't be any more expensive than another avenue of obtaining the same product. Well, that's a parity provision that is actually not in the BSA anymore. It's part of the record, but it wasn't. It is part of the record. It wasn't at this time. But the critical question, the relevance of price setting under 402A law and supplier is control of the product. And it's the entity that actually owns or controls the product. And back to Judge Smith's, or Chief Judge Smith's question, what is the definition of supplier under Pennsylvania law? In Francione, the court makes clear that the supplier is actually the entity that selects the product. And in NAF, they go on to say that the 402A is based on control over the product. Well, Musser says, Francione says that anyone who has a supplier enters into the business of supplying the public with products. Well, so if we look into the business of supplying products comes from comment F of restatement 402A, which is a very illuminating comment because it gives examples of what the restatement authors or drafters. That's the same thing, undertaken by one who enters into the business of supplying human beings with products, which may endanger their safety. Right. That part, the business is blind, deals with the problem of the commercial seller versus the occasional seller. The relevant portion of comment F is actually one paragraph below that, where the court gives as examples of what would be a seller, the wholesaler, the manufacturer, the retailer. These are all entities that exercise control of the product by selecting it, usually owning it, setting the price on it, and developing the offer. I thought the exception to comment F was the isolated sale. That's the first paragraph of comment F where it deals with, I think it gives the example of somebody putting together a jar of honey or jam and selling it to a neighbor. Mr. Murphy, are you aware that Amazon is apparently still selling the collar that broke and blinded Mrs. Oberdorf on its marketplace? I don't believe that's accurate. I think the seller has gone off. Well, I'm not saying it's the same seller, but it's the same collar. Well, there may be multiple sellers saying the same collar, and I don't, I don't have, there's nothing on the record. It's getting very critical comments, like after two months it broke into two pieces. I mean, there's nothing in this record relating to the 2014 transaction we're talking about. Right. I don't know. But as described in this case, the collar that Mrs. Oberdorf bought, that same collar is being sold by Amazon today. Well, yeah, and I don't know whether it's the same universal product code number or European article number that's identified in JA338. I just have no basis. But it has the same description. Well, even if you don't know those things, you, in your briefing, in your supplemental brief in particular, go to some policy arguments yourself to try to say, hey, we're not a seller. And among other things, you say Amazon does not have direct influence over the design and manufacture of third-party products. It's not equipped to pass on the quality of myriad products. Those are arguments you've made. But I believe the comeback to that would be that assumes the conclusion of the policy debate. It doesn't advance it. You're assuming that Amazon does not have direct influence. When the record seems to indicate that if anybody has influence over what's on its marketplace, it's Amazon. Amazon is absolutely one who, if it were on the hook for liability, would have a very powerful influence over design and manufacture of third-party products because people will do what they need to do to get onto your platform. So how is your policy argument not actually working against you? Amazon is not the 800-pound gorilla. It's the 8,000-pound gorilla. It's got more influence than anybody else. On that basis, since it's active in supplying the market, why shouldn't it be the one that you look to to say, well, you can really influence what's going on? Well, because product liability law and Restatement 402A is about control of the product in relationship to the particular product and transaction. Right. And your assumption is they've got no control. And I'm asking you if that isn't, in fact, inaccurate, that they have powerful control, that people will do what they need to do to get on your marketplace. So, indeed, you've got control. Amazon certainly has control over the marketplace and the Web site. But to say that an entity should therefore take control and get involved in other people's supply chain, and if it doesn't, then it will be treated as a seller would turn product liability law on its head. In fact, it has taken control. The Hoverboard cases that is reported case law, it's not extra record. It's from the case law. There's a recounting of exactly what Amazon had the ability to do, apropos of what Judge Jordan is asking you about. Well, Amazon, yes, it did take down all Hoverboard offers. I'm not being critical of that decision. I'm just pointing out that Judge Jordan's point is not imaginary. It's grounded in case law that we've seen. Well, certainly, I mean, any service provider has the power to react to information and say, hey, we're not really any service provider. Is Amazon really just a service provider? Yes, absolutely. It's no different. Well, did it testify before the House subcommittee? It was the old service provider. Well, I don't I don't I mean, I don't know what the precise testimony was. A lot of that testimony dealt with things like data security and so forth that really don't pertain to the product liability. We just tried to get a question. I ask you the same question I asked your adversary, which is let's assume we get past the seller supplier issue. We go to the factors. The majority of the dissent disagreed about whether we should be focusing on here's how the business model is set up now or how it could be given the latent power you have. But she's not exercise except maybe in the hoverboard case grounded in Pennsylvania law, which which is the right way to apply these factors based on how you have chosen to set up your business model or what you have the power to be doing. Well, I actually don't think either of those is correct. And I think it's helpful to look at the evolution of how those factors were used in. And I want to answer your question directly. But I think the history is important. In France, the only those factors were the reasons why the court did something. And there are in the frame for a problem. And if you read them literally, any when you compare any business to any consumer, the consumer is always going to win. It's a it's an incredibly broad test and it admits of no principled application. And for that reason, the Pennsylvania Supreme Court has significantly narrowed it down to basically nothing now. So you see the evolution and where it's applied in NAF. The court says, no, it doesn't. These things don't apply to a finance last summer, even though that is a service provider who clearly, in many cases, would be the only entity in a chain and so forth. In Musser, the court minimized the factors and said, oh, no, no. On two and three, we're really talking about having a continuous relationship with the manufacturer, even though that those words are not in the original phrasing in Pansione. And then in Coyle and Cofaso, the court uses those factors as reasons to deem somebody who may be a supplier, not a supplier. And in Faso, the court very clearly said these factors are only to be used to determine that somebody who has been already deemed a supplier. Thus, to activate for a two way is nevertheless not going to be liable. And so as a result, tracing the evolution of these factors, they become incredibly narrow. And frankly, if they weren't, if you just applied them literally as the plaintiffs would like you to do, it encompasses everybody. It encompasses DoorDash for delivering food from restaurants. It encompasses travel websites because they control their service. They decide what kind of entities can list hotel rooms, rent a cars, things like that. Mr. Murphy, you've just described the evolution of the case law, but Cofaso, which you say is narrowed it, right? Right. Not a single justice that heard Cofaso is still on that court. Right. Why shouldn't we certify it? Well, I think we have to be careful about predicting what the Pennsylvania Supreme Court would do based on changes of membership for a couple of reasons. One, we're not going to predict. Yes. Predicting or certifying. Two different. I have certified. So the reasons not to certify are I don't think it meets the criteria under Pennsylvania Rule of Appellate Procedure 3341, which is that there needs to be a need for a prompt and definitive resolution by the Pennsylvania Supreme Court. The Pennsylvania Supreme Court, much more recently than Cofaso, has taken a position that it is not the right body, that state courts aren't the right body to be making these legislative type conclusions. But isn't that a reason why the Pennsylvania Supreme Court in its discretion could turn down certification, not necessarily a reason why this body shouldn't at least make a petition for certification? Well, no, because there's also a federal question, which I understand the CDA is not up for argument right now, but there also is a federal question. But that's one side. Just what's the downside of certification? We certify. Assume we certify. Suppose we certify. The Pennsylvania Supreme Court can say, you know what, this doesn't meet our threshold for certification. We don't want it. And then it comes back to us. But we've at least given a state court body the ability to adjudicate an issue that they might think meets their threshold. Well, I think the downside is waste of time and futility. How much more futile is it for us to opine on something and then have them disagree with it? Even a superior court? Or have the legislature disagree and pass the bill. Indeed. And I find it fascinating that you say, you know, in your briefing that, and this is a quote, this court lacks authority to adopt sweeping new interpretation of southern liability. And at the same time, you assert that we shouldn't send it to the court, which you would have to admit does have the power to adopt a sweeping new interpretation of southern liability if it wants to. I mean, you can't really have it both ways, can you? You can't say to us, you don't have authority to do it. And then in the same next breath say, and you really don't have an opportunity or power to send it on. Well, I don't think that's correct. I mean, under theory, the court, of course, is supposed to be predicting what the state Supreme Court would do. And the state Supreme Court has been fairly clear in cases like Siebold and Lance. Stick with me. You've said we don't have authority. Doesn't that mean that we should send it to the court that does have authority? Well, no, because the court that does have authority has basically said that this kind of issue that is highly policy laden is not really appropriate for resolution by even the state courts. Maybe it'll say that. Maybe not. You went on for a while talking about the evolution of Pennsylvania Supreme Court issues. Each time you're talking about there's an evolution. I mean, isn't this kind of a fifth gen evolution that we should at least give them the opportunity to do? Because Cofaso might not have been obvious from just Francione, Nath, Musser, but Cofaso added value, just like Musser added value. Isn't the language in Cofaso, though, dictum? Cofaso decides. I think we're putting counsel in a difficult position. He now has two questions before him. I guess you get the choice to answer which one you want. I'm getting into danger where I won't remember all the questions. But to start with Judge Ross, no, it is not dictum. Well, look, appellants are not sellers, providers, suppliers or distributors of products such to activate 402A medical services. Then they say even assuming. Correct. When a court makes a decision and after that writes even assuming, that's what I call dictum. Well, they don't have to decide it. But the key rule of law, though, is the sentence you read right before the even assuming, which is in order to activate 402A, you have to be deemed a supplier. Well, that's circular reasoning. The four Francione elements are when you have a person supplying who is not a seller, how do you determine if they should be liable? To then say you don't apply those four factors until you have determined the person is a seller is picking yourself up by your own bootstraps. I don't think that's actually correct, Your Honor. The basic structure established in CAFASO is question A, are you a supplier? If you answer yes to that, only then do you get to the point. I like the dissent by Justice Caffey saying you say two different things in the very same page. One, it's a precondition. Another, that you decide they're a seller after applying the four-part inquiry. So which is it? It is that it's the majority statement that it is absolutely a precondition. But just before that, unless or appalling equipment could properly be considered a supplier after the application of a four-part inquiry. In other words, are you a seller-slash-supplier after the inquiry? And Justice Caffey is saying later on you say just the opposite of that. Which is it? All the more reason to certify, isn't it? Well, no, just because a dissent has a little bit different view from the majority. No, he's saying the majority goes both ways in the same page. I don't think that's a correct reading of CAFASO. That's just reading the language they have. Because the court talks about activating 402A. The precondition for that is supplier status. But that is as to hospital supplies. Period. Then, even assuming they give us a circular test on how you determine a liability if you don't have a seller, but say you've got to determine that it's a seller before you apply the four-part test. Now, that is circular reasoning if I have ever heard it. No, because they actually determine that it wasn't a supplier by analyzing a series of cases dealing with a hybrid situation. They're talking about hospital and medical supplies. Right. Period. And then they go on to hypothesize after they're even assuming what they want to do, but it has nothing concrete, tangential. It is tangential to what they decided. It has nothing concrete. Following up on what they decided is dictum. Well, I think perhaps the discussion of the policy factors is dictum because it was unnecessary to the decision. But they were reacting to an argument. I haven't read the briefing in CAFASO, but presumably one of the parties made the same argument that Mr. Wilk made here, that you should decide supplier status based on the application of policy factors. No, that's true. Okay. Excuse me just a moment, Judge Jordan. I think Judge Fix got squeezed out a little while ago when he had asked a question followed by another question. So, Judge Fix, if you'd like to restate your question, please feel free. Thank you very much, Chief. My question involves the notion that Pennsylvania Supreme Court law is evolving. You've said it repeatedly. It's a theme of yours from Francione to Knath to Muster to CAFASO. Each time something changes about this test, we either know that it doesn't apply to certain entities or that there may or may not be a precondition in dictum or not. My question is, if it is evolving, doesn't that counsel incredibly heavily in favor of giving them the option of taking that, what I'm calling fifth gen evolution, if there's really four cases before this that we should look at? Well, I don't think there's actually been any evolution beyond CAFASO. CAFASO is the capstone. But how do we know that? Because there hasn't been a fifth case that says, aha, CAFASO's stable state. I mean, I would hear your point completely if after CAFASO we had five cases and there was no issue, stable state. But right now, every time the Pennsylvania Supreme Court takes this case or an issue involving 402A, something about it changes. And so if something changes every time they touch it, isn't it fair to give them an opportunity? And maybe that's because it's so policy-laden. Isn't it fair to give them an opportunity to make that change to this one, which is really factually outside? We can try to say it looks like an auctioneer or a truck lessor, but Amazon's really different than that. And so shouldn't we give them a shot? Well, no, I actually don't think that this case would be the right vehicle for that. I mean, this case involves the bedrock principle established in the debate between Francione and Naft and footnote three of Francione about what is a supplier. And the Pennsylvania Supreme Court has been consistent throughout its jurisprudence on what that is. The supplier is the entity that selects the product. You don't think there's something qualitatively different about e-commerce? No, not in terms of the fundamentals of who sources the product, who sets the price, who controls the product. Of course there are different. Excuse me, who did you say selects the product? The third party seller. Let me, admittedly, this is a source that is not part of the record of this case. But I am curious to hear your response to this. On February 9th, the New York Times sought comment from Amazon about ad hoc ban on books. The third party sellers are permitted to sell. And Amazon's response was, as quoted in the Times, booksellers make decisions every day about what selection of books they choose to offer. Why did Amazon portray itself as a bookseller with the power to curate its offerings when here they're claiming to be the creator of the marketplace? Well, I now wish I'd read the New York Times on February 9th. I'm sure it's available. But to directly answer your question, there are situations where Amazon is the retailer, where it does select the product, sets the price. And I don't know the specific situation that that's being referred to. But Amazon does sell books. Amazon does sell other products. And when it does so, it's Amazon selecting the product, setting the price, developing the offer, and so forth, as opposed to the third party seller. If I could follow up, most of this conversation has been about this case, which is a sold-by and fulfilled-by third party. We've just had the hypo, which involves Amazon selling for itself, and you're not resisting the conclusion that 42A would make Amazon liable in that situation. Correct. We don't have before us, but most other courts have been addressing the intermediate, sold-by third party, fulfilled-by Amazon. Not clear whether or what we say about it in this case, but how does your logic about ownership or control apply to that situation, where Amazon is taking the product, it's warehousing it, it's setting a set of terms, it's plumping it up on the search results because it's prime eligible, it's shipping. Much more is being controlled in the fulfilled-by situation than this situation. What would you say about where that falls relative to the line you're drawing? Well, it falls on, they're both third party seller situations. This is a merchant fulfilled network case. You're talking about the hypothetical as a fulfilled-by Amazon case. Same result as the courts in Erie and Milo and Gabby have said, Federal Circuit and Fourth Circuit. And the reason for that is fulfilled-by Amazon is another service, a logistics service that Amazon provides. Yes, in that situation, Amazon has physical possession of a fully packaged product in its warehouse. It's stored in the seller's inventory. But all the fundamentals remain the same. It's a third party seller deciding what to sell, setting the price and so forth. Amazon acts essentially like a warehouse. And to your point about where something gets put in the results, I mean, it is inherent on having any online or really other source of information that some results will get presented first or in an organized way. You may finish your answer. Okay. Go ahead. Very quickly, Google, for example. You type something in, something gets ranked first. But that does not necessarily mean that a search engine has control over that content. Thank you, Your Honor. Thank you very much, Mr. Murphy. Mr. Wilk. Just on that last point, when you look at the law school article that we submit, Amazon actually bids keywords. So they are, by the straight bidding process, a vendor can choose a certain keyword, puts their product up top. Amazon is completely controlling what the consumer sees. How is that different than the owner of a mall letting people bid for the best space in the mall? Some real estate is at a more prime location than others, and then you'll pay a premium for that. How is that different from the circumstance where Amazon or Google or somebody else is letting people bid for better placement on their website? Well, in the mall situation, the consumer ultimately still chooses to enter this store or the marketplace. Actually, when you're searching on Amazon, based on the way Amazon curates results and factors in ways prime and sponsored, they are pushing the products to the consumer. It's a better spot on their website. I mean, you can still search and go through and find all the products if you want. They've just put it in a more prominent spot. Why is that different? Because Amazon benefits directly economically by selling products. They make a cut on every product. The mall owner makes more money by giving somebody a better position. I think when you look at how Amazon operates, it's way more than just here's a good location. They facilitate the products. My client never sees this dog collar if Amazon doesn't put it in front of her. What about percentage rent? You're familiar with percentage rent? Yes, I am, and that's based on a percentage. It's not that uncommon. So you're saying that a landlord of a shopping center that takes percentage rent is now on the hook because they have skin in the game? No, no, because they're not involved in the marketing process the way Amazon is. They're not involved in the price and setting parameters to what a brick-and-mortar store charges for whatever it is they're selling. Amazon is in this transaction and every transaction in a way that is unlike the brick-and-mortar situation in a mall. Before my time's up, I do want to push back on the idea that the panel or this court in holding Amazon liable as a seller is expanding Pennsylvania law. The district court below applied existing Pennsylvania law to Amazon. That's just what the panel did. They reached a different result. That's not expanding the law. That's applying it to a different entity that wasn't previously considered under the existing law. You know, we talk about Amazon, what they could do versus what they do do. I mean, Amazon in the business services agreement reserves to them the right to require a vendor to have insurance to indemnify Amazon. All they have to do is require it if that vendor wants to sell on their platform. They make no effort whatsoever to have a vendor be available for suit, to have a vendor be required to carry liability insurance for the sale of defective products. What easier step could Amazon take than that? What does that cost Amazon? They do require liability insurance, don't they? They can to protect Amazon. It's part of the agreement. Right. If they made them live up to the agreement, it would be there. That's right. If they ask, if they ask the vendor or require the vendor to do it, that is what they can do. That is a good first step. I'd be happy to take any other questions. Thank you very much, Mr. Wilk. A thank you to both the counsel in a case that obviously is an important one and presents this court with a number of questions, as our own questions certainly have foreshadowed here. Again, thank you all. I'll ask the court to adjourn the proceedings. Thank you.